First case is number 22-12877, Arno Resources v. Epic Tech. Mr. Brodsky. Thank you, Your Honor. May it please the court, Ben Brodsky on behalf of the appellate. The district court's order below contains two categories of error mandating reversal. The first category of error concerns the district court's finding that four of the individual defendants were not subject to the court's personal jurisdiction. And in making that determination, the district court drew every inference against the appellant and credited declarations submitted by the individual defendants that were at best opaque and at worst inculpatory. The second category of error concerns the district court's finding that as a matter of law, the software development agreement at issue permitted the appellees to assign it or rather the predecessor entity to the appellees to assign it. Dealing first with the personal jurisdiction issue, below the appellant alleged that the defendants, all of whom are family members save one, conspired to transfer unlawfully and in breach of a contract a software license that was owned by an entity called Gateway Gaming. And they did so using a web of Georgia-based companies that were formed and operated by the individual appellees. The individual appellees, four of them, not all of them, but four of them, moved to dismiss for lack of personal jurisdiction. And in opposing the exercise of jurisdiction over them, submitted declarations. Critically, the declarations which are in the record at docket entry 71-5678 do not rebut the well-pled allegations that they purposely used the Georgia company that they formed and sited in Georgia to create this web of entities that took assignments of the software license to which they were not entitled. The declarations do not deny that each of them had a role in those improper assignments. In fact, the declarations . . . One of the things the district court said, not all of it, but one of the things the district court said was that nothing about the alleged conspiracy as explained in the complaint suggests that the conspiracy was directed at Georgia. Why did the district court get that wrong? The district court got that wrong because the individual appellees formed companies that they based in Georgia and used those Georgia-sited companies to fulfill the conspiracy. I can't think of anything that would avail a defendant more of a particular jurisdiction than forming a company that it bases in that jurisdiction and within that jurisdiction committing the conspiracy. That is the quintessential availment of a jurisdiction to go there and commit a tort. There was no basis in the record for the court to conclude that this had not happened in Georgia. To the contrary, we alleged it did happen in Georgia. The defendants did not deny that it happened in Georgia. The declarations themselves, they acknowledge, although they do it in a very particular way, which itself should have raised the antenna of the district court, the declarants did not say which entities they owned. They merely said, and I'll quote, this is from Mosley Sr.'s declaration 71-5. Since 2014, I have not held any office or membership interest in any corporate defendant in this lawsuit. Which corporate defendant? Well, let me . . . with regards to ownership, if I can bring you back for a second so I can try to understand what you alleged and what the district court thought you alleged. The district court said that with regard to some of the defendants, you had not properly alleged that they were owners or officers of the six Georgia-based companies. In part, the district court said that the complaint alleged only that Mosley Sr., J.M. Caldwell, or others owned and controlled the relevant entities. And the district court thought that this was too broad, too nonspecific to make these defendants involved with the Georgia companies. What do you say about that? Well, I point the court to the allegation in paragraph 33 of the complaint where we said that Red Rocks, Epic Tech, and Frontier, as well as some of the other corporate defendants, are companies owned and controlled by Gateway Gaming's principals, which are Mosley Sr. and J.M. Caldwell. So we expressly alleged that they were owned and controlled by two of the individual defendants. And then we fled in the alternative that they were . . . or they were owned by family members, including two of the other defendants who moved for lack of personal jurisdiction, S. Starita Mosley and Tim Caldwell. We're allowed to plead in the alternative the ownership of the companies, especially if we're not certain at the time we bring the complaint whether, in fact, they are owners or managers. It is then incumbent on the defendants to say, I'm not an owner. I'm not a manager. But they didn't do that. They very carefully said, since 2014, I haven't been an owner of at least one of these companies. And they didn't even say which one. That's not sufficient to set up a record from which the court could find there is a lack of personal jurisdiction. And I would add, if you read these declarations closely, there are some critical differences between them. For example, Mosley Sr. says, I haven't been held in office or membership interest in any corporate defendant. Mosley Jr. says, I have never served on a board of managers or as an officer or employee for any corporate defendant. So does that mean that Mosley Sr. serves on the board of managers of these entities? Because these identical declarations that were all prepared by the same lawyer and submitted at the same time has this critical omission? Those were red flags from which the district court should have said, on this record, I cannot determine there is a lack of personal jurisdiction. Let me move back to the conspiracy question. I think you made your point about whether they're officers, owners, and their involvement in the companies or lack thereof. This is your conspiracy theory, that the companies were involved all in a conspiracy theory. But who is the conspiracy targeted at? Wasn't it targeted at Arno, right? Yes. Okay, so the target of the conspiracy is Arno. And Arno is a Texas corporation, right? That's true. How do you get around the fact that under Georgia law, when they take acts of non-residence and impute them for purposes of the long-arm statute to Georgia, the target of the conspiracy has to be a Georgia resident. That's what it's saying. To me, I'm just speaking for myself, that's a stumbling block. Help me with that. Well, I'm... You've just admitted the target of the so-called conspiracy is over here in Texas. That's true. Okay, that's what we're dealing with. Correct. I don't know if I would agree that as a matter of law, if a... Let's say a Georgia case says that, and we're looking at the Georgia cases, right? Yes. All right. If a Georgia case says that the target of the conspiracy must be in Georgia, then at least as to those defendants for which we are alleging personal jurisdiction based on the conspiracy, then we would not have personal jurisdiction. I would note, however, that this is not a conspiracy solely of non-Georgia residents. Some of the defendants are Georgia residents. Don't deny that they're subject to personal... Well, let's talk about the four you're talking about here, though, the ones you say that are on appeal about. Are they Georgia residents? The four who were... Yeah, yeah. No, they are not. Okay, so... Right. But the conspiracy includes the conspirators... It includes Georgia corporations, okay? And Georgia individuals. The point is the conspiracy has to be direct... I mean, you've got... They're directing it at a Texas company. If, in fact, the court were to determine that under Georgia law, conspiracy would not lie if it was directed only towards someone outside of the state of Georgia... No, it's not that conspiracy doesn't lie. It deals with jurisdiction. If the court would find that in order to have conspiracy jurisdiction, it has to be directed to somebody within the state of Georgia, someone who is a Georgia resident, then I would agree we would not satisfy that. I don't agree that that's the law, and I think that... You made your point, and you answered the question. Thank you. Okay. You've got a little time left. Sure. So let me move to the second category of error, which is the... Let me ask you a question before you start the argument. Sure. How long was the license to last? It was perpetual. It was a perpetual license. And in light of that, you're saying that the license holder could not transfer or assign without the consent of the others? Correct. That's completely inconsistent with the notion of a license, isn't it? Not at all, because if there were no such limitation, what would stop the licensee from saying, This is mine now. I'm going to sell it to you. I'm going to sell it to you. I'm going to sell it to you. I'm getting the money off of this now. This is my intellectual property. It couldn't be anything but, under these circumstances, that the license could not be assigned. Otherwise, the very value of holding that from my client would be eviscerated because it would become somebody else's property to exploit. And that's our whole issue here, which is we... But you've already given that license to somebody to exploit. And we got paid for it. Right. Right. And we sold that software many times, but never gave anybody the right to then take it and sell it themselves. When you get a license to use Microsoft Office, which you get and which is you buy the... Back in the days of CD-ROMs, you buy Microsoft Office. You don't then have the right to go and resell that just because you have a perpetual license to use it, even though Microsoft... You get to give it. Well, I guess that would depend on the terms of that license. Of course. Right? But that's the question here. Could the court determine, as a matter of law, that this license was assignable? On this record. Can I ask you a question? Section 5, termination, says this development agreement will in any event terminate when all projects set forth in Exhibit A have been completed, right? Yes. So that suggests that it's not an interminable... The development agreement itself is not interminable, right? True. Okay. And if the entire... And maybe I'm misunderstanding, but it seems like the basis for your argument that the licensing agreement couldn't be terminated was because the development agreement says that it cannot be assigned, and so the licensing agreement is part of the development agreement, right? Yes. Okay. But, obviously, the assignment part... In other words, it seems to me like there have to be different... Even setting aside the issue of, is the licensing agreement separate from the development agreement, there have to be different agreements within this development agreement because they don't all terminate at the same time. There are different clauses that have different lengths of duration. I don't know. I would say that this is a separable agreement that is this manifold combined agreement that has seven different agreements. I mean, it's one document. It's one agreement. Yes, some of the clauses survive and some terminate. In other words, not all of the rules about the development agreement that are in here apply to every single paragraph. Isn't that right? Could the court clarify that question? Well, not every provision within the development agreement applies to every other provision within the development agreement because they can't. We've just talked about how there are different times they terminate and things of that nature, right? Yes. Okay. So, but your argument is that the software agreement is subject to everything, all the parts of the development agreement that you want it to be subject to. And I guess I'm wondering how we distinguish between what parts of the development agreement apply to all the paragraphs and why they all apply in your view to the software licensing agreement. Well, I mean, this is the problem, right? How are we to determine that on this record? We can't. But to give one example, the district court below says, well, the agreement terminated and therefore the anti-assignment clause terminated along with it. Okay, well, the anti-assignment clause does not have a term stated on it, but neither does the license. So why does the, under that reading of the contract, why does the license not terminate when the agreement terminates? Like, how can, exactly, how can we pick and choose when there is an ambiguity about the terms of these agreements? We can't. Not on this record, we could take out. What does it mean, neither of the parties really did this in their briefs and to explicate general contract law with regard to this sort of puzzle or problem? Well, we cited the Rosen case. The agreements, to add another choice of law issue, there's a South Carolina choice of law clause in the development agreement. We cited the Rosen case, which is a South Carolina Court of Appeals decision, which is basically squarely on point. There was a question in that particular case about whether the beneficiary of a license could be changed. Could it be assigned, essentially? The trial court there said, no, it's because it's silent on it, that means it cannot be assigned. And the appellate court said, well, how do you know that? I mean, how can you tell because it's silent whether, in fact, it can or cannot be assigned? It's not something that's plain on the face of the agreement. It requires all kinds of interpretive rules and inferences and assumptions that are just not on this record. That's why the district court should not have made this determination as a matter of law. Okay, Mr. Brodsky, thank you very much. You've saved your full time for rebuttal. Thank you. Mr. Crosby. May it please the court, Clint Crosby along with Tyler Bishop on behalf of the appellees. This court should affirm the order of Judge Ross below. She correctly determined that the appellant failed to show that that court had personal jurisdiction over Mr. Mosley Sr. and Mr. J.M. Caldwell. As that jurisdiction, there was no satisfaction of the minimum contacts required of due process clause. Let me, I've got to inform myself about the intricacies of Georgia long-arm law, but I got to tell you, it feels really odd to think. You take the allegations of the complaint as true, except we're controverted, and it seems very odd to think that individuals who are alleged to have created Georgia corporations for an illicit act, no matter where directed, can't be sued in Georgia. It just seems nonsensical. You're being sued on specific jurisdiction grounds. It's not general jurisdiction. You, the defendant, created a Georgia corporation to do something illegal. It hurt me. I'm suing you in Georgia where you created the corporation to carry out the alleged conspiracy or illegal act, and you're saying you can't sue someone in Georgia for that? If you can prove jurisdiction, you can sue them in Georgia, Your Honor, but here what we have is the plaintiff has to prove the specific facts as to each individual defendant. In the AmeriReach case cited by Judge Ross, and in our brief, states you can't amalgamate those facts together. You have to show as to each particular defendant what act they have conducted that ties them to the forum state, and if you look at Judge Ross's order, she understood that and was very careful in it, and she went through and determined which facts were non-conclusory, and she bulleted down. So no defendant was involved with any corporation in the state of Georgia for this alleged conspiracy? Well, Your Honor, it's not the involvement. It's who did what. That's the name. It's a conspiracy charge. It's not a substantive claim. Conspiracy is agreement to do something illicit, illegal. But there still have to be the underlying acts tied to the state, and when the court looked at the complaint, there are very few. The court listed three actually tying the primary participants, talking about Mr. Caldwell and Mr. Mosley Sr. They created Red Rock, okay, yeah, created a Wyoming entity, place of business in Georgia. They, through Gateway Gaming, assigned the license agreement to Epic Tech. Epic Tech was in Georgia. That's really the transacting business element that Judge Ross found, and then there was a... Isn't that all Georgia-based? That is one act in Georgia, yes, but that, on the continuum, looking at the Diamond Crystals case, that spells out. It can't be random, isolated, fortuitous. We can't have one act that's going to subject an individual defendant to jurisdiction in Georgia. There has to be a substantial connection, and saying that they transferred, you know, one license is not sufficient. You can't then... If that's the alleged illegal act, you're telling me Georgia law will not sanction your personal jurisdiction? That... Okay. That is exactly what... I'm a Georgia resident, okay? I have a contract with you, a Texas resident, and you give me a license, okay? The agreement is very clear that I cannot assign or transfer the license without your consent, okay? I create a... I'm a Georgia resident. I create a Georgia corporation. I assign the license to that Georgia corporation and use the Georgia corporation to then sell the license to a third party to get more money for myself and cut you out without your consent. Is there a specific personal jurisdiction in Georgia against me? The... Under the analysis of the Diamond Crystals, and as Judge Ross well laid out, that's not sufficient. That one act is not going to meet the threshold of due process for, you know, for these individual defendants, and you can't... And if you... No, no. My hypothetical, not these defendants. Understood, Your Honor. Your hypothetical, under the analysis of the Diamond Crystals case... You cannot commit a one-act tort in Georgia as a Georgia resident and be held to specific jurisdiction in Georgia. That's what you're telling me Georgia law says. Your Honor, I'm telling you... I'm a Georgia resident, and I hit a Texas resident over the head with a bat on the streets of Atlanta, and I get sued for tort in Georgia. Is there a specific personal jurisdiction over me? Your Honor, I think in that case, yes, there's a specific personal jurisdiction. I only committed one act. I think what here we're... You're talking about an individual. The key part here is... Yes. We're talking about the individuals. The web alleged, the conspiracy alleged is... Pardon me. The web alleged is these web of companies. You have a web of companies. That's in their complaint, and then you have individuals that may hold different offices in those companies. Not every individual is going to be liable for every act of the company. You have to show... The plaintiff has to demonstrate that they are a primary participant. There has to be some... But you're saying the tortious act was by the companies, the corporate entities. They're the ones that transfer the licenses. Absolutely. Corporate entities are the tortious actors here, and what they're trying to get is jurisdiction over somebody who's an individual who's outside the state, who has some role. Maybe it's owner. Maybe it's stockholder. Maybe it's president. Has some role in those corporate entities. I'm just trying to help you out with the question. I don't know whether it's right or wrong, but the answer is that the parties that are committing the acts are the corporations in Georgia. Yes, Your Honor, and that's the American... Not these out-of-state individuals. But Georgia allows you to get these out-of-state individuals, even in that situation, if the resident, the person who's the... Because it then becomes a Georgia resident that's being targeted. So if the person injured here is a Georgia resident, you would admit they might have set in a chain of action that might get to that. Or maybe we don't have to reach that, but that's a different case. Exactly, Your Honor. That's a different case. I mean, yes, does Georgia law allow, under conspiracy theory, typically the case is you're tying into acts in Georgia by another individual. And that is appropriate under conspiracy jurisdiction, which Your Honor addressed earlier. And jumping a bit, the problem with conspiracy jurisdiction here, whether it be over Mosley Jr. and Starita Mosley, or if it's not really alleged, but vaguely against Mosley Sr., Mr. Caldwell, is we don't have a target of a conspiracy in Georgia. There is Arnault, as Your Honor noted, is a Texas... But if, in fact, the district court was correct on the merits, it doesn't matter, really, does it? The merits with regard to the agreement, Your Honor? Yes. Absolutely. We could obviate the jurisdiction issues if the district court was correct on the merits. Absolutely. As the court found, and I think even the appellate briefing is clear, all the parties agree that the development agreement is the keystone agreement in the case. So if this court upholds the determination of Judge Ross that the software license under that agreement is freely assignable, then that eviscerates all of the claims. I mean, the case goes away completely. It's not that simple, unfortunately, because you ask for dismissal, you, your clients, ask for dismissal on personal jurisdiction grounds. That is a dismissal without prejudice, without reaching the merits. For us to reach the merits as to your clients and enter a judgment which is binding later through collateral estoppel or res judicata, we have to have personal jurisdiction over them, unless you're waiving it on their behalf today. Your Honor, thank you. We're not waiving jurisdiction on their behalf. And we can't reach the merits on us to those clients. It can be sued somewhere. Understood, Your Honor. We bear the risk. If this court says that the agreement allows the software license to be freely assignable, but the four South Carolina defendants not subject to personal jurisdiction are still subject to a suit in South Carolina, we'll take that up in South Carolina. My only point is that we can't avoid the personal jurisdiction issue with regards to the individual defendants by ruling in your favor as to the other defendants on the merits. Understood, Your Honor. I get your point. But I think overall, however the case turns out, the assignability of the software license is ultimately key to all of the claims. No matter who the defendants are going to be, once we ultimately get to the conclusion, the key piece is that development agreement. Let's turn to that then. Certainly. So the development agreement, taking the context of that, the development agreement was for over $800,000 that was paid by Gateway Gaming to Custom Game Design, building a custom game set, these electronic games, and then also building the backend software that operates the games. One of the key facts, and I don't know if we made it as clear in our briefing, is Gateway Gaming paid to build the software that's part of the license. And of course, Custom Design maintained control of the software. They could license it themselves. They could go out and compete with Gateway or any successor entity and sell that software. But Gateway Gaming not only paid for its games, it paid for that software. So we don't have a dispute that we paid for the game-related pieces, we paid for the games. Those game-related pieces will not operate without that backend software. They are tied together. Excuse me, Custom Game Design was fully paid for that license. The only dispute that's here is now Custom Game later, its successors are saying, oh, no, no, that software license that you bought as part of your $800,000 to run your games, you don't get that anymore. You can't assign it. And Judge Rosenbaum was going into this earlier with regard to the termination provision. It's clear that upon delivery of all these deliverables, Exhibit A lays out everything, this agreement is done. So the deliverables are provided, which are the games, and are the software license. Custom Game Design is fully paid. The agreement terminates. It expressly states, the only thing that survives is warranty and confidentiality. Nothing about assignability, nothing about anything else. The parties... What about the software license then? If everything terminates, then does the software license terminate? And if it terminates, then how do you have any rights in it? Well, and Your Honor, the court has to read the contract as a whole. The Rosen case kind of talks the nature and character of the agreement. And so the reading there of everything terminates would create an illusory contract and an absurdity. It would say that I paid you $800,000, you gave me my software license and my games, and now I don't have it. I've got to walk away from my $800,000. So that is, again, it would be illusory at that point, I believe. Why couldn't it be that you have it for the length of the term that the contract is in effect? Well, the contract terminated. So it's almost instantaneous. It's only in effect until the games are delivered and the software license is delivered, and then it's gone. So if it was only in effect, I mean, that's an infinitesimal amount of time. So we don't have the benefit of our bargain. Where in the agreement do I go to to get something clear about the length of the term of the license? Well, both parties have made clear in the pleadings that it is a perpetual license. No, and I want to know where that comes from. From the plain reading of the agreement, Your Honor. There's no restriction in the license grant. There's no limiting language whatsoever. No, in the... In the plain terms. And the non-assignment provision is very specific. It says what terminates is the development agreement. Correct, Your Honor. Right, and really it makes sense that the non-assignment is needed because they don't want... They've agreed to develop the games and the software. You don't want them assigning that to Corporation C over here. You don't know to develop it. You say, you are who we hired to develop it. You will develop it, and you can't assign the development agreement. So it's really not inconsistent, and the non-assignment expressly refers to the development agreement. Correctly, and I can even... And there's no restriction in the wholly separate license clause. Well, correct, Your Honor, and even buttressing that, as you pointed out, was in our briefing. This is a high-dollar custom piece of software. The termination provision even provides that Gateway Gaming could terminate it if Mr. Hampey was no longer with Custom Game Design. That shows how key it was, the interrelationship of the parties. That's why it's non-assignable. It's an $800,000-plus contract. To your point, you don't want that to be freely assignable without consent. So if you look at what the contract was for, you can look at the subject matter of the contract. It makes sense that you wouldn't be able to assign the development part. See, I think it would be a closer case, in my view, if it didn't say development agreement. It said right... It's very clear it's the development agreement that's not assignable. I agree. It's very direct, Your Honor. And it would be a harder case if there were some limitation in the software license, but there's none there, and they even stipulate it's perpetual, but they somehow try to create an ambiguity between the two. Is that where we are? That's correct, Your Honor, and you're kind of alluding to what's in the Rosen case, saying silence on a particular item doesn't create an ambiguity by itself. It's silence and looking at the nature and character of the whole agreement. Is there an ambiguity? And as Your Honor pointed out, looking at the intellectual property clause, if any party wanted to say that that software license was not freely transferable, that was the place to put that language, and it's not there. Thank you, Your Honors. Thank you very much, Mr. Crosby. Mr. Brodsky, you've got a couple of minutes. Thank you. To address some of Judge Hull's comments, I would note this is the language of the assignment clause. The assignment may not be assigned by either party. The assignment may not be assigned? Excuse me, the agreement may not be assigned. Development agreement. May not be assigned by either party. We're talking about hypothetical language that the parties could have added. They could have said, custom game design is obligated to perform this agreement, and it may not assign its obligations to others. They didn't say that. If this was a one-way anti-assignment clause, because this was an $800,000 development agreement, and it was so important, then it would be custom game design that was not allowed to assign. But it says either party. Either party. The court has to give meaning to every word in that agreement, and that's where we're caught up. It's not that simple to just say the anti-assignment goes one way, because what's the anti-assignment for? The question is not whether it goes one way. The question is whether it applies to the intellectual property rights. And it says this agreement may not be assigned. The license is part of this agreement. I mean, at least arguably, one reasonable interpretation of it is. I'm not saying that as a matter of law, the court could have found that they cannot assign it, but I'm saying... But those two things run separately. They're temporarily distinct. The agreement doesn't have the same temporal scope as the intellectual property ownership. True, but there are, for example, ongoing obligations like warranties. There are other things that are included in this agreement beyond just developing the software itself. And when it's simply silent, can they assign? Especially in the context of this transaction where the value is the software, and that's what's exploitable, and that's where the value is, then there is at least a reasonable inference that we did not believe, and it was not our intent at the time we signed this, that it could be assigned. One last point on personal jurisdiction. I would just point the court to page 17 and page 23 of the court's order. On the one hand, the court says that by setting up a business to operate in Georgia and subsequently transferring the software license to that company, Moseley Senior and JM Caldwell purposely did some act availing themselves in Georgia, and then page 23, the court comes to the exact opposite conclusion on that same allegation saying, because plaintiff makes no allegation that Moseley Senior and JM Caldwell reached out to Georgia by setting up Red Rock, it would be... Do you think the district court made jurisdictional fact findings here? Yes. Okay, and you claim a court cannot make jurisdictional fact findings? Not on these declarations. Not on the evidence... Can't do inferences from the declarations? I mean, you're saying they've got to make... They can only find what's said there. That she's limited, the district court judge was limited to finding what they said. Correct. If the allegation was Moseley Senior and JM Caldwell went into Georgia, set up a company, and to use Judge Jordan's analogy, hit my client over the head with a baseball bat, and they don't come in and deny that saying, I never hit him over the head with a baseball bat. So you can see the district court judge can make jurisdictional fact findings. You're just saying, based on this record, she couldn't make the fact findings she did. Is that what you're saying? Yes. Okay. Okay, thank you both very much.